**Fannie SMITH, Administratrix of the Estate of Joseph Smith, Deceased, Plaintiff-Appellant,**

**v.**

**OLSEN & UGELSTAD, Defendant-Appellee.**

**No. 71–1574.**

United States Court of Appeals, Sixth Circuit.

May 8, 1972.

916

Samuel Posner, Detroit, Mich., for plaintiff-appellant; Posner & Posner, Detroit, Mich., on brief.

John L. Foster, Detroit, Mich., for defendant-appellee; Foster, Meadows & Ballard, Detroit, Mich., on brief.

Before The Honorable TOM C. CLARK *, Associate Justice, and McCREE and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

During an unloading operation on the ship M/V Makefjell on October 14, 1968, longshoreman Joseph Smith was crushed to death by a falling crate containing glass. His legal wife, and the administratrix of his estate, Fannie Smith, brought this action asserting the maritime claim for unseaworthiness against the shipowner, Olsen & Ugelstad.[1] In the same proceeding, the shipowner sought indemnity from Detroit Harbor Terminals, Inc., the stevedoring company which employed the deceased longshoreman.

* The Honorable Tom C. Clark, formerly Associate Justice of the Supreme Court of the United States, sitting by designation.

1. The action was instituted pursuant to Rule 9(h), Federal Rules of Civil Procedure. Rule 9 provides in pertinent part:

(h) *Admiralty and maritime claims.* A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82, and the Supplemental Rules for Certain Admiralty and Maritime Claims. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not. The amendment of a pleading to add or withdraw an identifying statement is governed by the principles of Rule 15. The reference in Title 28, U.S.C. § 1292(a) (3), to admiralty cases shall be construed to mean admiralty and maritime claims within the meaning of this subdivision (h).

The claim for unseaworthiness exists independently of the wife's recovery under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq.

The action was tried to the district court in admiralty. The court found as facts that the vessel's cargo of crates was securely and properly stowed, and that the accident occurred because supporting crates were negligently removed from under the crate that fell. The court concluded that the ship was seaworthy in all respects; that the death was caused by the negligent act of a fellow longshoreman; and that the stevedoring company failed to provide workmanlike service and therefore was required to indemnify the shipowner for reasonable expenses incurred in defending the action.[2] The administratrix appeals.

The M/V Makefjell was loaded with cargo in Hamburg, Germany by German stevedores. The cargo in hold #4, where the accident occurred, consisted of wooden crates each holding approximately one ton of glass. The crates were stacked four tiers high throughout the stow except near the hatches where three tier stacks permitted entry into the hold to check the cargo during the voyage. Each crate had three four inch skids[3] attached to its base to facilitate handling and stowage. Aside from stabilizing the stow, skids served to separate the stacked crates so that the blades of a fork-lift truck (hilo) could easily be inserted under the crate.

The Makefjell left Hamburg and proceeded to Montreal and then to the Detroit Harbor. The stow survived the North Atlantic crossing without shifting. When the ship arrived at Detroit, the stevedoring company sent its longshoremen and its equipment to unload the cargo. Prior to the accident, most of the crates had been removed from the hold. Remaining was a single line of crates four tiers high in separate stacks against the forward bulkhead. On the fourth level of one stack were two smaller crates. These companion crates (sitting side-by-side) covered a wider space laterally than those beneath them in the column. As a result, the outside skid on each of the companion crates extended beyond the sides of the stack below. To the right of this column were other stacks. To the immediate left of the column was a stack which a hilo operator was attempting to remove when one of the companion crates fell. The top crate of the latter stack had been removed without incident. The operator then removed two crates which were lower than the fatal crate and which partly supported it. This crate remained precariously balanced for approximately thirty seconds and then fell, striking Smith and instantly killing him. The normal procedure is to remove the higher crate first.

When the crate fell, Joseph Smith was supposed to have been following the hilo truck and fixing slings around the crates so that they could be lifted out of the hold. Instead, he remained behind carrying an empty cigar box and peering behind the stacked crates apparently in search of something.

On appeal, the administratrix challenges both the factual findings and the legal conclusions of the district court. She argues that the episode in hold #4 demonstrates that the vessel was unseaworthy. In assessing her claims, we first consider the assertions that the equipment used by the longshoremen was inadequate and that the carge was improperly stowed. The contrary findings by the court below may be disapproved only if they are clearly erro-

2. Although we need not review the allegations of error as to other findings and conclusions of the court below, we briefly mention those findings. First, the court found the deceased guilty of contributory negligence to the extent of 35% because he failed to watch for his own safety while pursuing his personal interests rather than attending to his job. Second, the court found that Joseph Smith had abandoned his legal wife and was living with and supporting another family. The deceased had not contributed to his legal wife's support for several years and the court concluded that she was deprived of no reasonably expected contribution to her support.

3. A skid is a wooden two-by-four runner attached to the bottom of the crate.

neous. Rule 52(a), Federal Rules of Civil Procedure; Utzinger v. United States, 432 F.2d 485 (6th Cir. 1970).

The applicable principles of maritime law are settled. The concept of seaworthiness imposes upon the shipowner the duty to furnish a vessel and appurtenances reasonably fit for their intended use. Mitchell v. Trawler Racer, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). That duty extends to a longshoreman engaged in unloading the ship. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Part of the obligation is to provide reasonably safe equipment, and the duty is nondelegable. *Id.* Thus even though the equipment belongs to the longshoring company and is used only by longshoremen, the shipowner remains liable for injury caused by the unsafe equipment. Alaska Steamship Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954).

It is argued by appellant that the operator failed to remove the top crate first because the hilo was incapable of accomplishing this. Four longshoremen offered their conclusions that the hilo would not reach the fourth level of crates. Three said that the shaft to which the fork-lift blades were attached was too short to raise the blades the necessary height. One stated that the shaft was too long and would hit the ceiling before the blades reached the necessary height. Opposed to this testimony was the fact that most of the crates of glass had already been removed without incident prior to the accident. The ship's watchman testified that the hilo operator removed without difficulty a crate which was stacked on the two supporting crates and which was to the immediate left of the one that struck Smith when it fell. In addition, the watchman testified that he later saw the same hilo remove the companion crate. In view of this conflicting evidence, we

cannot say that the district court was clearly erroneous in finding the hilo adequate for its intended purpose.

Appellant also challenges the finding that the cargo was securely stowed. She argues that different size crates should not have been stowed in the same stack and contends that dunnage should have been placed between the crates in each stack to prevent their sliding.[4] The longshoremen testified that dunnage was needed to secure the cargo. It is settled that cargo stowed unsafely may render a vessel unseaworthy. Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). There can be no doubt that uneven stacks or stacks without dunnage could possibly be unsafe. But the cargo here survived an ocean voyage without shifting and apparently was stable until the supporting crates were removed. The ship's watchman testified that no dunnage was necessary in this stow because all crates had skids and because the stow was secure. While the record leaves some doubt whether the stowage was perfectly secure, the evidence to the contrary is not so convincing as to compel us to conclude that the district court's finding on this point was clearly erroneous.

Appellant's final attempt at establishing unseaworthiness focuses upon the nature of the incident in hold #4 and upon the legal consequences deriving therefrom. She contends that improper unloading of the cargo created a dangerous condition which rendered the vessel unseaworthy. Appellant suggests in her brief that the removal of the supporting crates left the one that fell in a "dangerous and unsupported condition." Olsen & Ugelstad argues that the result of this "condition" was that the crate quickly fell. Appellee contends that the death of Joseph Smith resulted from the negligent act of the hilo operator and not from any condition of unseaworthiness.

---

4. Dunnage consists of pieces of board which may be placed between the various layers of crates and which runs the length across the crates. Its purpose is primarily to keep the stow level and secure.

Appellant correctly observes that an unsafe procedure prescribed for unloading cargo may result in a condition of unseaworthiness. *See* A. & G. Stevedores v. Ellerman Lines, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). And unseaworthiness may occur when the unsafe condition is only temporary or transitory. Mitchell v. Trawler Racer, *supra.* It is now clear, however, that an isolated personal act of negligence does not constitute unseaworthiness. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). In finding that a single and unforeseeable act of negligence created no condition of unseaworthiness, the Supreme Court recently stated:

A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service.

What caused the petitioner's injuries in the present case, however, was not the condition of the ship, her appurtenances, her cargo, or her crew, but the isolated, personal negligent act of the petitioner's fellow longshoreman. To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions. Id., at 499–500, 91 S.Ct. at 517.

Thus it is necessary to determine whether the death of Smith resulted from an act of negligence or a condition of unseaworthiness. Very likely a resolution of this problem will often involve metaphysics as well as judgment. A negligent act conceivably could produce a hazardous condition or it might be completed without causing this result.

The determination of the distinction will oftentimes be elusive and will depend upon the particular facts of the given case. Here, as the District Court found, the ship's cargo was stowed securely and the hilo operator was aware of the fact that the higher crates should be removed first. There was evidence that he did not do this because he would have been required to climb down from the truck and adjust the fork-lift blades in order to remove the crates of smaller dimensions which were on the top level. From this evidence it was reasonable for the court below to find that the hilo operator acted negligently and that no condition of unseaworthiness was created or called into play.

The District Court's determination that the longshoreman's death resulted from an isolated, unforeseeable act of negligence and not from a condition of unseaworthiness is further supported by the fact that the fatal injury occurred within thirty seconds after the falling of the crate.

Accordingly, the judgment of the District Court is affirmed.